UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIM. NO. 20-10071-ADB |
| RICO PERRY, | ) | |
| | ) | LEAVE TO FILE GRANTED |
| Defendant | ) | ON 4/20/2020 |

GOVERNMENT'S OPPOSITION TO EMERGENCY MOTION FOR RELEASE

The government respectfully submits its opposition to Defendant's Emergency Motion

for Release from Detention (the Motion"). [Docket 51]. By means of the Motion, defendant

Rico Perry ("Perry" or "defendant") seeks his release from confinement pending trial. He does

so based on "the emerging lethal threat of COVID-19," contending that he is particularly at risk

because he suffers from asthma. Motion at 1. He also contends that the case against him is

"paper-thin." Motion at 3. But it is Perry's description of the state of the evidence which is

itself paper thin but which nonetheless manages to get wrong a number of the few facts that it

does set forth. In fact, the case against Perry is very strong and establishes that Perry and his

codefendant, Keith Cousin ("Cousin"), were about to embark on what they believed would be

the robbery of a Mexican drug cartel of 10 kilograms of cocaine when they were arrested. As a

result, they are charged with conspiracy to commit a Hobbs Act robbery, in violation of 18

U.S.C. § 1951, and conspiracy to distribute and to possess with intent to distribute 5 and more

kilograms of cocaine, in violation of 21 U.S.C. §§ 846, the latter of which is punishable by a

mandatory minimum term of 10 years in prison and creates a rebuttable presumption that no

condition or combination of conditions will reasonably assure Perry's appearance and the safety

of the community. *See* 18 U.S.C. § 3142(e)(3)(A).

Moreover, the evidence set forth below establishes that the Plymouth County

1

Correctional Facility ("Plymouth") has taken substantial steps to protect staff and inmates from COVID-19 infection, including inmates, like the defendant, who suffer from pulmonary issues. Indeed, so effective have these procedures been that not a single Plymouth inmate has tested positive for COVID-19. Accordingly, because the record shows that Perry is extremely dangerous and cannot rebut the presumption that he should be detained, and because there is no reason to believe that Perry is any more at risk of contracting COVID-19 at Plymouth than he would be anywhere else, the Motion should be denied.

<u>THE CHARGED OFFENSES AND OTHER EVIDENCE OF DANGEROUSNESS</u>

The defendant, together with Cousin, is charged by indictment with conspiracy to commit robbery, in violation of 18 U.S.C. 1951, and conspiracy to distribute and possess with intent to distribute 5 and more kilograms of cocaine, in violation of 21 U.S.C. 846. The evidence underlying the indictment is based on an ATF undercover "sting" operation. The evidence shows that an ATF cooperating witness ("CW") informed ATF in October 2019 that Cousin was a member of the Columbia Road street gang who had recently been released from jail, having been charged with murder and found not guilty at a jury trial in May of 2019. The CW informed ATF that Cousin was actively requesting that people locate drug dealers with stash houses in possession of money and narcotics, and to report back to the defendant with the information.

On January 7, 2020, Cousin met with the CW and an ATF undercover agent ("UC") who was posing as a disgruntled courier for a drug cartel that was expanding its operations into the Boston area. The meeting was recorded. The UC was seeking assistance in robbing the cartel of 10 kilograms of cocaine. Cousin and the CW had previously discussed this opportunity but this was the first time Cousin had met the UC. The UC told Cousin, in substance, that he delivered cocaine for the cartel; that the cartel used a different stash house on each occasion that the UC performed a delivery; that the UC never learned the location of a particular stash house

until shortly before he was to pick up the drugs; that every time he arrived at a stash house the same two members of the organization were there, at least one of whom was armed with a pistol; that the UC would pick up 2 kilos for delivery but would see that 10 kilos were there; and that only when he had been given the 2 kilos he was to deliver was he told the location to which he was to make the delivery.  During the meeting, which took place in the CW's car as he was transporting the UC from Logan Airport to a nearby hotel, Cousin expressed his understanding of and interest in participating in the robbery, ultimately telling the UC that the UC could not have not picked someone better and that he understood he was dealing with people whom "the cartel entrusted to watch they drugs" and that there would definitely have to be some type of "hostile takeover."

On the next day, the same three men met at the hotel. This time Perry, whom Cousin had recruited, was present. **The meeting was recorded.**[1]  The UC provided the same information to Perry as he had provided the previous day to Cousin. Perry, like Cousin, expressed his understanding of and interest in participating in the robbery. During the UC's explanation, Cousin told Perry that this meeting was necessary because, "When it comes to life changing situations, it's that much more in the planning." Cousin then said, "If you ain't planning, you planning to fail." Cousin and Perry then discussed how the robbery should be committed. Cousin proposed that they simply "rob" the UC of the 2 kilos he was given because it was a sure thing, but Perry objected, indicating that would put the UC in danger with the cartel, and stated, "I'm going in there… I ain't playing."  Perry added that upon entering the house, he immediately wanted to put a "gun" to the first guard's head, take him "hostage," and use him as a "shield" so that the guards could be subdued, so as not to "let off a shot".  During the meeting

---

[1] Some of the facts are highlighted because they directly contradict Perry's version of events.

the UC had Cousin and Perry confirm that they would not sell the cocaine they acquired through the robbery with the cartel stamp still present and both men confirmed they would not do so. Perry said that the cocaine he obtained was going "straight to the stove," i.e., would immediately be converted to crack cocaine.  At the end of the meeting Cousin told the UC that this type of job would require two men with "machineguns" and a third man with a "handgun."  Perry did not disagree.

A gram of cocaine has a street value of approximately $100.   A kilogram of cocaine thus has a street value of approximately $100,000, and ten kilograms a street value of approximately $1 million.  In this case the UC told Perry and Cousin that the cartel's cocaine was "pure." Because cocaine ordinarily is "cut" with another substance before being sold on the street, the street value of pure cocaine would be significantly higher, depending on the amount of "cut" ultimately added to it.

The UC set the proposed robbery for January 28, 2020. There was testimony at the detention hearing regarding of the events of that day, including the arrest of Cousin and Perry. Exhibit 2 summarized those events from the point of view of the UC.  **His interactions that day with Cousin and Perry were recorded.** As the Court may recall, both Perry and Cousin were suspicious of the UC that day, apparently because when they arrived in the area of the Hilton Garden Inn in East Boston where their initial meeting that day was supposed to take place, they "made" a police surveillance vehicle. The UC provided them with another location at which to meet – a CubeSmart located on McClellan Highway. When Cousin and Perry arrived at that location in a blue Honda the UC asked if they were "ready" and had their "guns and everything." Perry responded affirmatively and said that when they were doing this type of business they did not carry their wallets or anything else with them. The UC asked Cousin if it would be just him and Perry, and Cousin said there was one more crew member, who was the

"driver," who had the firearms and was "right around the corner." The UC indicated the driver should come to the CubeSmart but met with resistance. They all then got into the UC's vehicle, where Perry started asking why the UC's "beanie" looked like it had a brim inside it and wanted the UC to give it to him. When the UC demurred Perry and Cousin got out and walked toward the Honda. The UC got out and asked whether they were "cool," saying that "I just want you guys to be cool with it, and if you not, then you not.  You know, like?  It's up to you guys." Cousin said they were "cool" and then he and Perry got into the Honda and drove off. A few minutes later the UC called Cousin to ask if they were "good." Cousin said he was going to get the third member of the crew and would be returning shortly. The UC said, "If you all still with it, grab your mans and come back.  If not, it's all good, you feel me?"  Cousin said, "Yeah."

Ultimately Cousin and Perry returned on foot, having parked the Honda a short distance away. During this meeting, the UC asked Cousin if he had brought the third member of the crew, and Cousin indicated he had not and said that since there was so much "confusion" they no longer needed the third member. Perry then returned to the subject of the "beanie" and continued to express concern about it. They all then entered an empty storage unit that the UC had rented as a rendezvous location for after the robbery.  Cousin said he and Perry had "bad nerves," especially after seeing the law enforcement vehicle, and the UC indicated everyone had "nerves." Cousin and Perry disrobed to the extent necessary to show they were not wearing wires. Cousin said that was what was supposed to be done "as men," and Perry said he just wanted to "make it home" and "benefit." The UC then did the same, warning Cousin that he did have a firearm. The UC then turned his hat inside-out to show there was nothing behind the brim.  Cousin said that made him feel "so much better," **and Perry agreed, stating "I ain't going nowhere.  We'll get the job done."**

Shortly thereafter Perry started speaking on his cell phone with someone whose

nickname the UC understood to be "Trick" but, based on information provided below, was actually "Trigg." At the end of the conversation Perry told Cousin, "We just gotta grab him." It was clear at this point that Trigg was the driver and Cousin and Perry had not, in fact, decided to proceed without him. **Cousin and Perry started walking toward a vehicle that the UC had provided for their use in the robbery.  Perry shouted to the UC that they would be right back.**

They were arrested either as they were entering or had just entered the vehicle.

<u>EVIDENCE REGARDING THE DRIVER</u>

At the time of the detention hearing the government was still in the process of investigating the person believed to have been the "driver." Accordingly the government objected to efforts on the part of the defendants to obtain information in this regard through cross-examination. The government no longer has these concerns and therefore provided in its initial proffer in opposition to Cousin's effort to obtain release [Docket 32],[2] and provides here, information showing that there was, in fact, a driver participating in the events of that day.  Although the government intends to supersede the indictment to add this individual as a codefendant, at this time he is an unindicted coconspirator and thus, in the spirit of Local Rule 116.1(C)(1)(e), the government will refer to him by his nickname, "Trigg," rather than by his true name.

<u>Text Messaging Between Perry and Trigg</u>

After the arrest of Cousin and Perry, ATF recovered their cell phones. Believing there was an individual in the immediate area who was potentially in possession of machineguns and

---

[2] The government incorporates herein by reference as if fully set forth herein the Government Proffer and attachment [Docket 32] and the Government's Further Proffer and attachments [Docket 48].

other firearms, and given the exigent circumstances thus presented, ATF searched the cell

phones just for information from that day to determine if there had been contact with someone

who might be the driver. ATF saw some text messaging on Perry's phone with an individual

identified as "Trigg."  The messages took place over time, between 6:46 a.m. and 12:26 p.m.:

1/28/2020 6:46AM

PERRY:          "What we looking like"

Trigg:          "Js charging up my leg be there in 25min"

PERRY:          "Ok cool"

Trigg:          "Im outside"

PERRY:          "Yeah come up stairs I happen to just be looking"

Trigg:          "Ight"[3]

Trigg:          "Im at the door"

Trigg:          "Downstairs"

1/28/2020 12:26PM

Trigg:          "Wtw we feeling to make move cuz"

PERRY:          [Began to type] "150" [but did not send message]

The term "charging up my leg" is vernacular for charging a GPS monitor.

<u>Law Enforcement Follows Wrong Vehicle</u>

There was a phone number associated with these messages. However, agents had

observed a particular vehicle in the area of the undercover operation and saw the driver on his

cell phone at the same time as either Cousin or Perry. Believing this could be the driver, law

enforcement followed the vehicle to a location in Lynn and then sat outside a home watching it.

---

[3] "Ight" is short for "alright."

Ultimately a woman came out of the residence and entered the car, and it was pulled over. It became apparent that the person the agents had seen, the women's son, worked at or near Logan Airport and had been in the area to pick up a check. By this time the opportunity to find the driver in real time had been lost.

### Trigg's Phone and Vehicle

However, agents learned the identity of the subscriber to the phone number associated with the text messages. It proved to be Trigg. RMV records showed that Trigg has a black BMW registered to him. As indicated above and at the detention hearing, Cousin told the UC and the CW that he had seen a black SUV that he believed to be a law enforcement vehicle near the hotel parking lot. ATF Special Agent Daniel Campbell was in fact present near the Hilton Garden Inn parking lot prior to the arrival of the UC that morning and observed a black BMW SUV parked on a street near to, and with a view of, the parking lot where the meeting was supposed to occur. SA Campbell observed Cousin exit his Honda, look in the direction of the BMW, approach in the direction of SA Campbell, and then return to his vehicle. Once inside of his vehicle, Cousin and the BMW simultaneously drove away.

### Evidence from Trigg's Court-Ordered GPS Monitoring

ATF agents also ran a criminal history for Trigg. They learned not only that he has a criminal history, including convictions for drugs and firearms, but also that he had an open state firearms case at the time and was wearing a court-ordered GPS monitor. ATF obtained information for Trigg's movements on January 28, 2020 from the Massachusetts Probation Services Electronic Monitoring Program ("ELMO"). It showed the following, among other things.

As indicated above, Trigg replied to Perry's text at 6:37 a.m. by indicating that he was charging his GPS monitoring bracelet and would "be there in 25min." Per ELMO data,

sequential GPS readings for Trigg on January 28 at 6:00:00 a.m., 6:00:37 a.m., 6:21:18 a.m., and 6:47:36 a.m. put him at the same location, with a speed of zero, near an address in Brockton, MA, indicating he was at home and not moving.

The next set of sequential ELMO GPS data readings are from 6:53:53 a.m. to 7:28:13 a.m. and depict a general path of movement from Brockton to Quincy, MA (Winter Street). As set forth above, Trigg texted Perry early in the exchange that he would "be there in 25min," and sometime later Trigg texted Perry, "Im outside." The next set of sequential ELMO GPS data readings are from 7:35:45 a.m. to 8:31:38 a.m. and reveal the same coordinates in Quincy, MA (Winter Street) with a speed of zero, indicating Trigg was not moving. Investigation into Perry revealed that a particular woman was listed on Perry's Inmate Web jail profile as a "friend" with an address on Winter Street in Quincy. Perry's Massachusetts Driver's License also lists this Winter Street address in Quincy as a mailing address.

The ELMO data points from 9:41:33 a.m. to 9:52:33 a.m. show that Trigg traveled toward the Woodville Street area, where he was stationary from 9:46:33 a.m. to 9:48:33 a.m., and that he then continued toward Creston Street in Roxbury.  From 9:53:33 a.m. to 9:59:34 a.m., GPS coordinates put Trigg at the same coordinates, with a speed of zero, in the area of Creston Street in Roxbury. Further investigation into Perry via the Accurint LexusNexus Database revealed that an address on Creston Street is a previous residential address associated with Perry.

At approximately 11:04:16 a.m. Trigg continued his travel through the Ted Williams Tunnel, exiting the tunnel at approximately 11:06:49 a.m. At approximately 11:07:49 a.m. Trigg was travelling north on Route 1A in East Boston.  From 11:18:50 a.m. to 11:24:50 a.m., Trigg left the area of Faywood Avenue and Orient Avenue and traveled to the area of the Hilton Garden Inn on Boardman Street in East Boston. From approximately 11:25:50 a.m. to 11:29:49

a.m., Trigg was stationary on Leyden Street, across from the Hilton Garden Inn. It is at this point in time, and at approximately the same location as previously mentioned, that SA Campbell observed a black BMW SUV leave the area simultaneously with Cousin, after Cousin mentioned seeing a law enforcement vehicle in the area. SA Campbell observed the vehicle exit northbound onto route 1A, a/k/a the McClellan Highway, and from 11:30:39 a.m. to 11:32:49 a.m., GPS points show that Trigg left the area of Leyden Street and again traveled north on Route 1A.

EMLO GPS location data show that Trigg then remained in the same immediate area, circling the streets near to Cousin's and Perry's meetings with the UC, until 1:12 p.m., right after Cousin and Perry were arrested at approximately 1:06 p.m. At 1:12:44 p.m. GPS points show that Trigg began to head south on Bennington Street, and that he then drove back to Brockton. He made one short stop in Boston along the way at a location that was not covered by surveillance cameras. Trigg arrived in the area of his Brockton address at approximately 2:34 p.m. and stayed there until the last entry on his ELMO GPS data at 10:00:00 p.m.

<u>Evidence from Police and Private Business Surveillance Systems</u>

ATF has also obtained surveillance camera footage relevant to the events of January 28, 2020.  In particular, ATF obtained footage from two privately-operated surveillance systems near the address on Winter Street in Quincy referred to above. Between them, the footage shows that at around 7:27 a.m. a black SUV drove in front of the address on Winter Street associated with Perry and parked in the parking lot between that address and another on Winter Street. Shortly thereafter, Trigg got out of the vehicle and walked to the front door of the other address on Winter Street. He was not carrying anything. Trigg entered the front entryway and waited until he was granted access. He then walked through the lobby, past the elevators, and entered

10

the stairwell.  He walked to the second floor and entered the first apartment on the left.

At around 7:57 a.m., Perry exited this same apartment, walked down the stairwell, and exited via a side door.  Perry returned to the apartment, left, and then returned again.

At around 8:33 a.m., both Perry and Trigg left the second-floor apartment, entered the stairwell, and walked down to the first floor.  Trigg was now carrying a bag in his right hand and a brown item that appeared to be a jacket in his left hand, while Perry was carrying a car seat. They both exited via the side door. Trigg went to his black SUV with the bag and the brown item, and Perry entered the Winter Street address associated with him with the car seat.

At around 8:39 a.m. Perry left an apartment in the Winter Street building associated with him and then left the building. He got into Trigg's SUV and they left the parking lot at around 8:40 a.m.

At around 9:52 a.m., a Boston Police surveillance camera captured Trigg's car on Creston Street in Boston. It stopped on Creston Street and a man consistent in appearance with Perry got out of the vehicle and entered a building, and then returned to Trigg's vehicle, which then left the area.

ATF also obtained video surveillance footage from cameras in the area of the meetings with the UC: a Burger King located at 944 Bennington Street in East Boston, and an East Boston Savings Bank located at 856 Bennington Street in East Boston. The video footage shows the following, among other things.

At 11:44 a.m. a black BMW consistent with Trigg's car arrived at the Burger King parking lot and parked.

At 11:54 a.m., after the UC had texted Cousin the address for the CubeSmart, Perry left a Subway located two stores away from the Burger King and got into the black SUV.

At 12:07 p.m., Cousin's blue Honda arrived in the Burger King parking lot and

parked next to the BMW.

At 12:09 p.m., Cousin's vehicle, which now also contained Perry, left the parking lot. According to other information in the investigation, they arrived at CubeSmart at 12:14 p.m. and left at 12:23.

At 12:26 p.m. Cousin's car returned to the Burger King parking lot. Cousin and Perry got out a minute later. At 12:28 p.m., Cousin went into the Burger King and Perry got into the BMW. Two minutes later Perry went into the Burger King.

At around 12:43 p.m., Cousin's vehicle left the Burger King parking lot. Trigg's car left the parking lot at around 12:44 p.m.

At around 12:45 p.m. Cousin's vehicle entered a gas station and Cousin appeared to pump gas. The car departed the gas station about a minute later.

There is no further surveillance footage depicting Trigg's vehicle after this point, although as indicated above ELMO monitoring shows that he was in the area until after the arrest of the Cousin and Perry.

Preliminary Cell Phone Information

As indicated above, Cousin's and Perry's cell phones were recovered at the time of their arrests. The extractions from the phones pursuant to search warrants were not available until the afternoon of March 23, 2020, owing to coronavirus-related staffing issues at the ATF laboratory.   As of the morning of March 24, 2020, a very preliminary examination, primarily of Cousin's phone, included the following.

First, on the day before the robbery was to take place, Cousin was engaging in internet searches regarding firearms, interspersed with some telephone conversations. This extraction report was attached as Exhibit A to the Government's Further Proffer [Docket 48] with the pages marked A-0001 to A-0007. These searches appear to have begun at 1:09:05 a.m. on

January 27, 2020, and ended shortly after 5:49:59 a.m.  Overall, the Web History is replete with searches regarding the shooting of various compact submachineguns, including but not limited to the MAC-11 (A-0001, Items 4, 7, 10-11), and the Cobray Arms M-11 (A-0001, Items 5 and 6).  These searches also include searches in general for various types of subcompact machineguns, including the Masterpiece Arms mini 9mm (MAC-11 Clone) (A-0001, Items 8-9); the MAC-11 with a laser scope (A-0002, Items 12-13); the MAC-11 with 100-round and 50-round drums (A-2, Items 14-18); and the MAC-11 and 9mm MAC-11 submachinegun (A-2, Items 21-23). These searches ultimately appear to have been interrupted by a call from Perry, referred to as "Coco," at around 5:52:29 a.m.  (A0007, Item 92).

These searches are significant because Cousin told the UC and the CW at the end of the meeting at the Hilton Garden Inn on January 8, in the presence of Perry, that the robbery would require two men with machineguns and another with a handgun.  He also referred to the robbery as "life-changing."  And certainly the robbery of a Mexican drug cartel of 10 kilos of pure cocaine would be just that.  Cousin also conceded to the UC the day of the "robbery" that he had "nerves," something to be expected not only because he was suspicious of the UC but also because robbing a drug cartel of drugs worth $1 million or more is an extremely dangerous enterprise.

Attached as Exhibit B to the Government's Further Proffer are internet photographs that reflect an extreme interest in firearms on the part of Cousin, including various types of subcompact machineguns.  The last two items are different, however: they appear to have been created on December 11, 2019 and to depict the cooking of crack cocaine.  (B-0013 to B-0014, Items 63-64).  Cousin and Perry are, of course, charged in Count Two with conspiring to distribute and possess with intent to distribute 5 and more kilograms of cocaine, and Perry indicated at the February 8 meeting in the Hilton that his share of the cocaine was going "straight

to the stove."

A preliminary review of text messages from Cousin's phone revealed some text messages on the morning of the "robbery," January 28, 2020, between around 6:16 a.m. and 8:47 a.m. These messages were between Cousin and a person referred to herein as "Individual 1." They begin with Individual 1 sending Cousin a text reading, "It's there under the stairs." At around 6:17 a.m. Cousin responded, "15Min [sic] away," and at 6:18 a.m. Individual 1 said "Ok I put ur headphones in the bag to[o]." There followed some text messages whereby Individual 1 sought to confirm that Cousin had "got it," which Cousin confirmed through a response at 8:46 a.m. Cousin's phone was subject to a "ping" order at the time, and "pings" of the phone during the period of the texting generally showed Cousin to be in close proximity to Individual 1's home. Given the timing of these messages and the cryptic nature of them, ATF believes it likely that the bag that Individual 1 left contained a firearm or firearms that either Individual 1 was providing or, more likely, was holding for Cousin.

ATF had even less time to examine Perry's phone before the filing of the Government's Further Proffer on March 24, 2020. However, ATF located a series of instant messages between Perry and another person, referred to herein as "Individual 2," that occurred between around 8:40 p.m. and 9:00 p.m. on January 27, 2020, the night before the "robbery." To put the messaging in context, it is helpful to know that the UC texted Cousin at around 7:30 p.m. that evening, saying, in part, "I'm on my layover in ATL. Be there [in Boston] late tonite bro. I'll hit your when I land." At around 10:18 p.m. the UC placed a recorded call to Cousin and told him he had landed in Boston.

During the messaging between Perry and Individual 2, they referred to Cousin as "bump" or "bumpy." Individual 2 began the messaging with the words, "Shit bump was supposed to come back and scoop me [pick me up] but he said he had to run to the bean

[Boston]."  Shortly thereafter Perry sent the following message to Individual 2, who appears to have known about the plans: "But Dude ain't land yet," clearly a reference to Perry's understanding that the UC had not yet arrived in Boston.  A short while later Perry said, "Man I am only coming out when it's time to," and a bit further yet in the messaging said, "Sitting around them [apparently referring to the other conspirators] dirty ain't my cup of tea."  "Dirty" is a common slang term for being in possession of a firearm.

Cousin's Conversations with the CW Regarding Firearms

      Cousin had several conversations with the CW during the period leading up to the "robbery," some of which contained references to the possession of firearms by Cousin.

      For example, on January 9, 2020, Cousin called the CW, who was not expecting the call and therefore was not prepared to record it.  Most of the conversation was unrelated to the stash-house robbery, but during the conversation Cousin did tell the CW that he had "MACs" for the robbery.  A MAC-11 is both a specific make and model of subcompact machinegun and a general street term for any such firearm.

      On January 25, 2020, the CW recorded a phone call with Cousin.  During the call, the defendant said, "We gotta sit down, we gotta round up everything, I just came up on another [inaudible], I got it right now."  The CW asked Cousin, "Another breezy?"  Cousin responded, "Yeah."  "Breezy" is another street term for a firearm.

      And on January 27, 2020, the day before the robbery was to occur, the CW had another recorded conversation with Cousin.  During the conversation Cousin emphasized the importance of maintaining communication for something that is "life changing."  Later in the conversation Cousin said, "Everything gotta be secure bro.  You gotta have vehicle, you gotta have fucking artillery, you gotta have [pause], all of these different things in effect."  Cousin said sometime after this that "It's going to have to be nothing less than three, four motherfuckers bro … to

overwhelm these motherfuckers."   The reference to "artillery" is an obvious reference to firearms.

<u>Further Examination of Perry's Phone</u>

Further examination of the extraction from Perry's phone shows, among other things, that on October 18, 2019, he took a photograph of a Sig Sauer, Model P229, semi-automatic firearm, a copy of which is attached hereto as Exhibit D.  ATF is highly confident that it is a real firearm because, in addition to its general appearance, the serial number is visible.  (The agents have been unable thus far to conduct a trace on the firearm because the ATF employees who generally perform this task have been unavailable due to the coronavirus pandemic.)

The extraction also shows, among other things, that there was additional messaging contact between Perry and Trigg, beginning on January 24, 2020.  Among other things, at around 7:42 p.m. on January 27, 2020, Perry sent the following message to Trigg: "Dawg is in ATL in a lay so we looking good."  This is an obvious reference to the UC's layover in Atlanta and an obvious indication that Trigg knew what was going on and was part of the conspiracy.

<u>CONDITIONS AT PLYMOUTH</u>

In addition to contending that the case against him is "paper-thin," Perry claims, in essence, that the measures taken at Plymouth to date to protect inmates from coronavirus infection are insufficient or nonexistent and that he is particularly at risk due to his asthma. However, although, as described in the Motion, there certainly are some jails and prisons that have had very unfortunate outbreaks of COVID-19, Plymouth is not one of them.  Instead, as indicated above, to date not a single inmate has tested positive for the virus, and Plymouth has taken substantial steps to keep it that way.

Attached hereto as Exhibit A is the Declaration of Sheriff Joseph McDonald, Jr. ("Sheriff Declaration" or "Sheriff Decl."), a declaration that was completed on April 15, 2020, and filed in

*Pedro Abibe Augusto, et al., v. Antone Moniz,* Civil Action 20-10685-ADB.  Given the nature of that litigation the portions of the declaration specific to the "petitioners" are not applicable to Perry's situation[4], but the portions of the declaration setting forth precautions taken facility-wide are.  Those portions show that Plymouth maintains a full-time medical staff.  [Sheriff Decl. ¶ 3]. This includes a medical doctor who is on-site 40 hours per week, a nurse practitioner or physician's assistant who is on-site 36 hours per week, and on-call coverage 24 hours a day. [*Id.*].  Since the onset of the COVID-19 outbreak, the precautions Plymouth has taken to protect the exposure of inmates and staff to the coronavirus include, but are not limited to, adopting treatment and detection practices consistent with CDC and DPH guidelines; suspending visits by friends, families, and volunteers, and replacing them with two free telephone calls per week; restricting attorney visits to non-contact and disabling monitoring and recording functions for visit phones; keeping non-essential staff from entering Plymouth; ceasing inmate work assignments outside Plymouth; eliminating unnecessary movement within Plymouth; establishing a housing unit for newly admitted inmates and inmates who have left and returned to Plymouth in which such inmates remain until they have cleared the incubation period; working with the courts to limit travel outside Plymouth by having hearings conducted by videoconference and telephone; changing recreation and meal schedules to reduce the number of inmates in the recreation and meal spaces at the same time; maintaining an aggressive cleaning regimen for the housing units; educating staff and inmates with respect to sanitation and proper social distancing; providing inmates with soap at least once a week; providing inmates with cleaning supplies; conducting temperature screening for all employees, contractors, and visitors to Plymouth; and providing surgical masks for all inmates and staff.  [Sheriff Decl. ¶ 6].  There currently are approximately

---

[4] In particular, the government understands that Perry is not in a unit in which each inmate has his own jail cell but rather is in a unit in which, at present, there are three inmates per cell.

731 inmates and detainees at Plymouth, not one of whom has tested positive for COVID-19. [Sheriff Decl. ¶ 7].

Moreover, only one of the 642 full-time and 235 part-time employees has tested positive, having developed symptoms after working on March 19, 2020.  [Sheriff Decl. ¶ 8].   That employee has not been back to Plymouth since then.  [*Id.*].  Consistent with DPH guidance, Plymouth traced the employee's contacts within Plymouth and kept out of the facility for at least 14 days any other employee who had had close contact with the affected employee.  [*Id.*]. Plymouth also used surveillance footage to ensure that the employee did not have close contact with any inmates, having maintained a distance of at least six feet and having worn a mask and gloves during all encounters.  [*Id.*].[5]

Attached as Exhibit B is the Declaration of Lawrence Baker, M.D., who, among other things, has been the Medical Director at Plymouth for nine years ("Doctor Declaration" or "Doctor Decl.").  Among other things, the Doctor Declaration indicates that if an inmate presents with fever and any other symptoms, medical staff must perform a rapid test for Influenza A and B, and if that test is negative, perform a test for COVID-19.  [Doctor Decl. ¶ 10].  If that test is positive, then, among other things, the inmate is kept in medical isolation; staff must wear a mask with a shield, as well as gloves and a gown; and medical isolation must be maintained until the inmate has been free from fever for at least 72 hours, the inmate's other symptoms have improved, and the inmate has tested negative with respect to at least two consecutive respiratory specimens collected at least 24 hours apart.  [Doctor Decl. ¶¶ 10-11].  When Plymouth receives a new inmate, he is screened for signs and symptoms of infection, and, if the inmate appears symptomatic, a mask is applied immediately and the inmate is isolated.  [Doctor Decl. 18].

---

[5] The Sheriff Declaration contains additional information regarding the efforts to safeguard inmates and staff at Plymouth.

Plymouth also takes steps to ensure that staff does not introduce COVID-19 into the facility, steps that include education, screening staff for raised temperatures and other symptoms, and instructing staff not to work if they feel ill and to report symptoms for follow-up thereafter. [Decl. ¶ 19].  Plymouth also monitors and reviews all inmates who have chronic disease or other morbidities that would make them more susceptible to a COVID-19 infection.  [Doctor Decl. ¶¶  20, 22-23].

The government understands that there currently are 51 inmates at Plymouth who suffer from asthma, COPD, or cystic fibrosis.  None of them has tested positive for coronavirus.  Once again, owing to the procedures in place at Plymouth, not a single inmate has tested positive for COVID-19.

ARGUMENT

Perry seeks his release from pretrial confinement on two grounds.  First, he argues that the case against him is "paper-thin at best."  Motion at 3.  Second, he argues that no precautions are taken at Plymouth to protect him against contracting the coronavirus even though he suffers from asthma.  Neither argument has any merit.  The case against Perry is, in fact, extremely strong, and the evidence shows him to be a dangerous man who was prepared to take part in the armed robbery of a cartel stash house.  In addition, the evidence presented herein demonstrates that Plymouth has taken significant precautions to protect staff and inmates from contracting the virus, steps that have thus far resulted in no positive tests for the virus among the inmates, including inmates who, like the defendant, suffer from pulmonary disease.

The Case for Detention

Because the robbery that Perry and Cousin conspired to commit involved the theft of 10 kilograms of cocaine, Perry is charged in Count Two of the indictment with conspiracy to distribute and possess with intent to distribute 5 and more kilograms of cocaine, in violation of

19

21 U.S.C. § 846.   This charge carries a mandatory minimum term of 10 years in prison, 21

U.S.C. § 841(b)(1)(A)(ii)(II), a maximum possible sentence of life, *id.,* and a presumption that

no condition or combination of conditions of release would reasonably assure Perry's appearance

or the safety of the community, 18 U.S.C. § 3142(e)(3)(A).  Even without this presumption, the

record shows by clear and convincing evidence that no conditions would reasonably assure the

safety of any other person and the community.

Taking the strength of the case first, the following is the sum total of what the defendant

says in the Motion regarding the case against him:

> Although this case alleges a conspiracy to rob a Mexican drug
> cartel stash house, the government's case can be described as
> paper-thin at best.  There are no recorded statements of the
> defendant suggesting that he was prepared to act on this proposed
> plan.  There was no stash house.  No reconnaissance had been
> done.  Although the government enticed Mr. Perry to listen to
> their undercover agent solicit them, Mr. Perry literally walked
> away from the offer.  More specifically, he was arrested after he
> attempted to drive away in what turned out to be an inoperable
> government van.  Mr. Perry was found to be unarmed after he was
> placed under arrest.  Upon information and belief, the government
> has not seized any weapons that were alleged to have been part of
> this scheme.

Motion at 3-4.  But contrary to Perry's assertion, the government's case is not paper thin at best:

it is not paper thin at all.  Perry's few factual assertions are either untrue or of no moment.

While the government relies ultimately on the description of the case set forth above, it responds

here to the specific claims that Perry makes.

First, Perry contends that "[t]here are no recorded statements of the defendant suggesting

that he was prepared to act on this proposed plan."  That is simply wrong.  Perry was an active

participant in the discussion regarding the proposed robbery at the Hilton Garden Inn on January

8, 2020.  **That meeting was recorded.**   Indeed, during the meeting Perry disagreed with

Cousin's suggestion that they simply "rob" the UC of the two kilos that he was going to pick up,

saying instead, "I'm going in there… I ain't playing."  Perry also said that, upon entering the

stash house, he immediately wanted to put a "gun" to the first guard's head, take him "hostage,"

and use him as a "shield" so that the guards could be subdued in such a way that they could not

"let off a shot".  At the end of the meeting Cousin told the UC that this type of job would

require two men with "machine guns" and a third man with a "handgun."  Perry did not

disagree.  Again, **this meeting was recorded.**

"There was no stash house.  No reconnaissance had been done."  While these statements

are true, they are immaterial.  This was a sting operation.  The underlying premise was that the

cartel never used the same stash house twice and that the UC only learned of its location on a

particular occasion approximately 15 minutes before he was to pick up the drugs for delivery.

This was explained to Cousin on January 7 and to both Cousin and Perry on January 8.  It was

an entirely credible precaution for a drug cartel seeking to protect its product to take.

"Although the government enticed Mr. Perry to listen to their undercover agent solicit

them, Mr. Perry literally walked away from the offer."  This is also untrue, for several reasons.

First, the government did not "entice" Perry to listen to anything: it was Cousin who brought

Perry to the meeting on January 8.  Second, as noted, Perry was an active and enthusiastic

participant in the discussion in the Hilton.  And third, he did not "walk away from the offer" but

instead showed up with Cousin the day of the proposed robbery, 20 days later, something he

certainly would not have done were he not intending to participate in the robbery.

"More specifically, he was arrested after he attempted to drive away in what turned out

to be an inoperable government van."  To the extent this statement suggests that Perry was not

planning to participate in the robbery at the time he was arrested, it, too, is wrong.  It is true that

Cousin and Perry had concerns about the UC after Cousin saw a law enforcement vehicle near

the location where they first intended to meet with the UC.  However, after the UC had shown

21

Cousin and Perry that he was not wearing a wire and had turned his hat inside-out for them, Perry said, **"I ain't going nowhere. We'll get the job done."** Perry and Cousin had no difficulty expressing their concerns when they had them, and there is no reason to think that they would not have persisted in expressing their concerns and simply left in the blue Honda if they were not committed to participating in the robbery. Moreover, while it is true that Perry and Cousin were arrested either as they were getting into or had just gotten into the car that the UC had provided to them for use in the robbery, that is consistent with their continued intent to participate in the robbery and inconsistent with an intent to back out. Moreover, Perry had just been on the phone with Trigg, had told Cousin that they had to pick Trigg up, and ultimately indicated that he and Cousin would be back shortly, obviously after getting Trigg. After satisfying himself that the UC was not a member of law enforcement, Perry never retreated from his statement "I ain't going nowhere. We'll get the job done." Again, had Perry and Cousin had any different intent, they would have gotten into the Honda, not the vehicle that was provided for their use in the robbery.

It is true that Cousin suggested in the argument after the initial hearing that if Cousin and Perry were actually going to pick up Trigg they would have done so in the blue Honda rather than in a vehicle he would not recognize, and that the fact they were getting into the vehicle provided by the UC shows they were intending to steal government property rather than engage in the robberies. But the record is full of evidence that everybody that day had cell phones. If there were any concern that Trigg would not realize it was Cousin and Perry in the vehicle, they simply had to call him. Or send him a message. Or FaceTime him.

"Mr. Perry was found to be unarmed after he was placed under arrest." That is true. Cousin and Perry obviously returned to continue the meeting with the UC with the object of allaying their concerns about him. They were prepared to show they were not wired as part

of an effort to have the UC do the same.  If it turned out their suspicions were founded, they did not want to be caught with guns.  Indeed, while it is entirely possible they both were armed at least with handguns during the first meeting with the UC, the evidence shows that Perry got into Trigg's car in between the meetings and thus had an opportunity to leave any firearms there before returning to the CubeSmart.  As it turned out, Perry and Cousin ultimately believed the UC was not affiliated with law enforcement and were prepared to proceed with the robbery.

"Upon information and belief, the government has not seized any weapons that were alleged to have been part of this scheme."  This statement is true.  However, the evidence shows that Trigg almost certainly had possession of the weapons that were to be used in the robbery.  First, in the initial meeting with the UC at CubeSmart, Cousin, in the presence of Perry, told the UC that there was a driver and that he had the guns.  That statement is admissible against Cousin as non-hearsay and against Perry as the statement of a coconspirator in furtherance of the conspiracy.  There is no reason for Cousin to have made the statement were it not true.  Second, it is clear from the text messages between Perry and Trigg to the GPS data from Trigg's court-ordered monitoring to the images from the surveillance cameras that Trigg was involved and was, in fact, the repository for the weapons. It is true that ATF has not recovered the weapons. In the interest of full disclosure, it is also true that agents approached Trigg on January 31, 2020 and he consented to a search of his home and his car which did not result in the recovery of weapons. This shows no more than that three days later he (wisely) no longer had possession of the guns. It is also true that Trigg gave ATF permission to search what he claimed was the relevant cell phone, which was in his vehicle at the time of the search. This phone, however, had no SIM card and clearly was not the phone that he was using on January 28, 2020. At the end of the day, the evidence

shows Trigg leaving a Winter Street address on the morning of January 28, 2020 carrying a bag he did not have with him when he entered the address earlier, and it is likely this bag contained one or more firearms, including very possibly the pistol appearing on Perry's phone. The evidence also strongly suggests, as set forth above, that Cousin also had firearms that day – his own phone shows far more than a casual interest in firearms, including subcompact machineguns, and he told the CW more than once that he had firearms – and there was plenty of opportunity for Cousin to provide those firearms to Trigg during the time they were all in East Boston.  It is also very likely that Trigg's detour on the way back to Brockton after Cousin and Perry were arrested is where he turned over the weapons to somebody else or otherwise disposed of them.  Finally, and probably most importantly, there obviously is no way Perry and Cousin were going to rob a drug cartel of $1 million worth of cocaine without firearms, including very likely machineguns, and these firearms had to have been somewhere close at hand that day.

In short, there is very strong evidence that Perry was embarked that day on an extraordinarily dangerous criminal enterprise in which he and Cousin were planning to use machineguns and other firearms to rob a drug cartel.  That alone is sufficient to establish Perry's danger to the community.  He also, however, is a distinct danger to at least one individual: the CW.  While there is no evidence that Perry and the CW had ever met one another before Cousin brought Perry to the Hilton meeting on January 8, Cousin knows the CW, and Perry has now met him face-to-face twice.  Perry almost certainly knows the CW's identity through Cousin, who also is being held at Plymouth.  Perry has a 2013 conviction from Suffolk Superior Court for intimidation of a witness.  And, as the photograph on his cell phone attached as Exhibit D reveals, Perry has access to firearms.  Releasing Perry would thus pose a danger not only to the public at large but also to the CW in particular.

24

There also is evidence that Perry has engaged recently in other behavior showing his danger to the community.  According to detention hearing Exhibit 2, when Perry was still seeking to assure himself that the UC was not affiliated with law enforcement, he "explained his concern by providing that he had just done 'some shit with somebody' whom he had provided with a 'burner'.  PERRY then stated that the individual 'called the police' on him, while PERRY was 'in the house doing it[.]'"  [Detention Hearing Exhibit 2, ¶ 13].  The term "burner" is well-known street slang for a firearm.  In the course of this explanation, then, Perry spoke not just of having a firearm, and not just of having provided a firearm to another individual, but also of having done so in the context of some sort of home invasion.

The conditions of release proposed by Perry simply do not sufficiently mitigate this danger.  As to electronic monitoring, undersigned counsel had understood until recently that it is not available currently due to the pandemic, and, as discussed below, poses an unacceptable risk to the health and well-being of the Probation Officers who would be involved in the home visits necessitated by the process.

In addition, while Perry's fiancé, JL, has indicated her willingness to serve as a third party custodian were Perry to be released, the Motion states that "JL is gainfully employed with a steady job, and health care benefits."  Motion at 3.  While certainly laudable, and while JL's health care benefits certainly are important, particularly as regards Perry's and JL's younger daughter, it is not clear who would be serving as third party custodian to the extent JL were to be at work, unless her job is one that she can perform from home.

In any event, these conditions would not sufficiently protect the public and the CW. Accordingly, the Motion should be denied.

Coronavirus Issue

Perry contends in the Motion both that inmates are at an increased risk of contracting

COVID-19 in general and that he suffers from asthma and thus is at a particular risk of infection. The government certainly sympathizes both with members of the general public and with inmates in this time of uncertainty.  However, in light of the measures that have been taken at Plymouth to protect staff and inmates and the remarkable success with which those measures have met to date, there is no reason to believe that the defendant is any more likely to contract the coronavirus at Plymouth than would be the case were he to be released.  In addition, release of Perry would result in increased danger to others.  Finally, while certainly not determinative, a New York Times article from April 16, 2020, attached hereto as Exhibit C, indicates that early data show that asthma is not, as expected, among the top ten COVID-19 risk factors.

First, as indicated, given the substantial medical and other procedures in place at Plymouth, and given the track record at Plymouth to date, the defendant is probably less likely to catch COVID-19 in Plymouth than he would be if released.  Perry cites stark statistics regarding the positive tests for coronavirus across the United States at the time he filed the Motion, as well as the more than 16,000 deaths that had resulted.  Motion at 2.  Perry also states that "[t]he spread of the virus in Massachusetts jails has already killed at least two people."  *Id.*  But the experience of that jail and other affected jails has not been the experience at Plymouth.  Again, the procedures that are in place at Plymouth to protect against the infection of inmates and staff, and to address an infection were it to occur, are substantial, and have resulted thus far in no positive tests among inmates.

And this is not because there are no inmates who, like Perry, suffer from asthma or other pulmonary diseases.  Undersigned counsel was informed that, as of Friday, April 17, 2020, there were 51 inmates suffering from either asthma, cystic fibrosis, or COPD, and to date none of them has tested positive for the virus.  Moreover, if Perry has in fact been prescribed an inhaler at Plymouth, it appears that Plymouth is aware of and is dealing appropriately with his asthma.

In short, in light of the affirmative substantial steps that Plymouth has taken and is taking to protect staff and inmates from infection, Perry is almost certainly at no greater risk in Plymouth of contracting the virus, and may very well be at a lower risk of doing so.

Second, releasing Perry could well result in increased danger not just to himself but to others was well.  For example, one of Perry's proposed conditions of release is "house arrest, with GPS monitoring if possible[.]"  Motion at 4.  Until recently undersigned counsel understood that electronic monitoring was not being ordered due to the risk it would pose to Probation Officers responsible for home visits to set up and/or monitor the equipment.  Undersigned counsel has since learned that this may not inevitably be the case.  Were such monitoring to be ordered, however, and were it to require home visits on the part of Probation, that would clearly expose the Probation Officers involved to unwarranted risk.

In addition, while the government sympathizes with Perry and with JL regarding the serious health risks that their second child has experienced, and while it is fortunate that she currently is stable and living at home, *see* Motion at 3, if Perry were correct that he is at an increased risk of contracting the virus at Plymouth (which the government does not believe to be the case), he would likely be placing his daughter at an increased risk of infection by returning home.

Finally, Perry has provided the Court with evidence that asthma is regarded as presenting an increased risk of contracting the coronavirus.  And, candidly, that had been the government's understanding based on reports in various media.  However, according to a New York Times article entitled "Asthma Is Absent Among Top Covid-19 Risk Factors" published on April 16, 2020 and attached hereto as Exhibit C, this may not be correct.  The article reports, among other things, that "this month, when New York State, the epicenter of the outbreak in the United States, began releasing data on the top 10 chronic health problems suffered by people who died from

27

coronavirus, asthma was notably absent from the list." The article states that "[h]ealth experts have generally seen little to no evidence that asthma increases the risk of developing Covid-19[.]" As to the outcomes for individuals with asthma who do contract coronavirus, a doctor with the American Lung Association said that "[i]f you have mild or moderate disease, you're probably not going to behave much differently than someone who doesn't have asthma, particularly if you're a younger person," although this same doctor observed that persons with more severe cases of asthma "may get more severity of the disease." A doctor at another hospital who specializes in pulmonary medicine said that one would assume that patients with underlying lung diseases would be "at risk of worse outcomes" but that "asthma is underrepresented" in patients sick enough to seek treatment.

It is important to note that the article indicates that "the data analysis on the effects of asthma is in its infancy, and health experts cited an existing body of research that shows the flu and milder coronaviruses exacerbate asthma as worrisome indicators for those with Covid-19." The article does nonetheless indicate, based on the early data from New York, that individuals who have asthma are not necessarily at an increased risk of contracting the coronavirus, or, if they do contract it, of having worse outcomes than individuals who do not have asthma.

In any event, as noted, it appears that Plymouth is aware of Perry's asthma and is treating this condition appropriately. Moreover, the evidence shows that Plymouth does have in place protections to minimize the risk of infection by staff and inmates, and to deal appropriately with infections in the event they occur. To date one staff member has tested positive and has not returned to Plymouth since March 19, 2020. More importantly for these purposes, not a single inmate has tested positive. Accordingly, in light of the record as a whole, the risk of infection by the coronavirus is not a basis for releasing a defendant who clearly should otherwise be held on grounds of dangerousness.

28

CONCLUSION

For the foregoing reasons, the government respectfully maintains its position that Perry

should be detained pending trial.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:      /s/Robert E. Richardson
ROBERT E. RICHARDSON
Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

Suffolk, ss.:                                              Boston, Massachusetts
April 20, 2020

I, Robert E. Richardson, hereby certify that this document filed through the ECF
system will be sent electronically to the registered participants as identified on the Notice of
Electronic Filing (NEF).

/s/Robert E. Richardson
ROBERT E. RICHARDSON